**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| INCORPORATED VILLAGE OF LYNBROOK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OSHKOSH CORPORATION; PIERCE MANUFACTURING, INC.; REV GROUP, LLC (formerly REV GROUP, INC.); E-ONE, INC.; FERRARA FIRE APPARATUS, INC.; KOVATCH MOBILE EQUIPMENT CORP.; SPARTAN FIRE, LLC; SMEAL SFA, LLC; SMEAL LTC, LLC; DETROIT TRUCK MANUFACTURING, LLC; AIP, LLC; AMERICAN INDUSTRIAL PARTNERS CAPITAL FUND IV, LP; AMERICAN INDUSTRIAL PARTNERS CAPITAL FUND IV (PARALLEL), LP; AIP/CHC HOLDINGS, LLC; AIP CF IV, LLC; AIP/CHC INVESTORS, LLC; ROSENBAUER AMERICA LLC; ROSENBAUER SOUTH DAKOTA, LLC; and ROSENBAUER MINNESOTA, LLC,<br><br>Defendants. | **Case No. 26-cv-1915**<br><br>**CLASS ACTION COMPLAINT**<br><br>**INDIRECT PURCHASER ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Incorporated Village of Lynbrook (Lynbrook"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to its own acts and purchases and, as to all other matters, upon information and belief after reasonable investigation.

## I. NATURE OF THE ACTION

1. Volunteer fire companies occupy a distinctive place in American history. Benjamin Franklin, who helped organize one of the nation's earliest volunteer fire companies in Philadelphia in 1736, observed that citizens confronting fire possessed no shortage of *"Hands or Good-will,"* but needed *"Order and Method."* For nearly three centuries, that tradition of

organized civic service has remained a cornerstone of fire protection in communities throughout the United States.

2. Lynbrook provides fire protection through a volunteer-based fire service.

3. This is an antitrust class action[1] arising from a long-running scheme in the highly concentrated United States market for fire engines, ladder trucks, pumpers, aerials, rescues, tankers, wildland apparatus, and related custom fire equipment ("Fire Apparatus").

4. Lynbrook is a municipal purchaser that has acquired Fire Apparatus during the Class Period (described in ¶ 206, below) for use by the Lynbrook Fire Department.

5. Beginning no later than January 1, 2016, Defendants' consolidation, suppression of manufacturing capacity, coordinated information exchanges, dealer-territory restrictions, uniform cooperative-purchasing pricing, and other parallel and concerted practices to restrict output and raise, maintain, and stabilize prices at supracompetitive levels.

6. The Fire Apparatus market is uniquely vulnerable to coordinated conduct.

7. Municipalities cannot forego replacing mission-critical emergency vehicles.

8. Entry into the Fire Apparatus market is difficult and expensive, lead times are measured in years, and the market has become dominated by three manufacturer groups—REV Group, LLC ("REV Group")[1] Oshkosh Corporation ("Oshkosh"), Pierce Manufacturing, Inc. ("Pierce"), and Rosenbauer America, LLC ("Rosenbauer") (the "Manufacturer Defendants") which together control at least 70% of domestic sales.[2]

---

[1] The Class consists of the Injunctive Class (described in ¶ 195 below, the New York Damages Class (described in ¶ 208 below), and the New York Governmental Class (described in ¶ 209 below).

[2] Rev Group operates a portfolio of Fire Apparatus brands including E-ONE, Inc. ("E-ONE") Ferrara Fire Apparatus, Inc. ("Ferrara"), KME Fire Apparatus ("KME"), Spartan Fire, LLC ("Spartan"), Smeal Fire Apparatus ("Smeal"), and Ladder Tower ("LT"). In February 2026 REV Group, Inc. became part of Terex Corporation through a stock-for-stock transaction, and its Fire Apparatus business continued.

9. During the Class Period, prices for commonly purchased Fire Apparatus rose far faster than relevant producer price indices and ordinary inflation.

10. Pumpers that historically cost roughly $300,000 to $500,000 rose toward or above $1 million, while aerial and ladder apparatus that historically cost approximately $750,000 to $900,000 rose toward or above $2 million.

11. At the same time, order backlogs expanded dramatically and manufacturers increasingly imposed or exploited floating-price provisions and post-order surcharges.

12. Lynbrook's procurement records reflect, among other purchases, two pumpers awarded in 2019 for approximately $739,996 and a 100-foot aerial ladder truck awarded in 2023 for approximately $1,489,000.

13. Lynbrook's Class Period Fire Apparatus purchases were made through one or more dealer or distributor intermediaries rather than in a direct purchase from a Manufacturer Defendant.

14. Lynbrook seeks treble damages, costs, and attorneys' fees under New York's Donnelly Act for overcharges passed through the distribution chain and paid by Lynbrook.

15. Lynbrook also seeks declaratory and prospective injunctive relief under Sections 1 and 2 of the Sherman Act and Section 16 of the Clayton Act.

16. Lynbrook and the proposed Injunctive Class (described in ¶ 195 below) face a continuing threat of injury because municipalities must continue to purchase replacement Fire Apparatus and related equipment in a market distorted by Defendants' continuing conduct.

## II. PARTIES

### A. Plaintiff

17. Lynbrook is an incorporated village and political subdivision of the State of New York located in Nassau County, New York. Fire protection and emergency response services within the Village are provided by the Lynbrook Fire Department under Village authority.

18. During the Class Period, Lynbrook purchased Fire Apparatus for its own use.

### B. Manufacturer Defendants

19. Oshkosh is a corporation, headquartered in Oshkosh, Wisconsin. Oshkosh, through Pierce and related operations, designs, manufactures, and sells Fire Apparatus throughout the United States.

20. Pierce is a Wisconsin corporation headquartered in Appleton, Wisconsin and a wholly owned subsidiary of Oshkosh.

21. Pierce manufactures pumpers, aerial platforms, ladders, tillers, tankers, rescues, and other Fire Apparatus and sells through factory-direct channels and a nationwide dealer network.

21. REV Group is the successor to REV Group, Inc. and is headquartered in Wisconsin.

22. REV Group operates a portfolio of Fire Apparatus brands including E-ONE, Ferrara, KME, Spartan, Smeal, and Ladder Tower.

23. REV Group designs, manufactures, markets, and sells Fire Apparatus through a portfolio of fire-apparatus brands and subsidiaries, including E-ONE, Ferrara, KME, Spartan Emergency Response, Smeal, Spartan Fire Chassis, and Ladder Tower.

24. Those brands collectively manufacture aerials, pumpers, tankers, rescues, wildland apparatus, and other specialty Fire Apparatus.

25. E-ONE, Inc., manufactures custom and commercial Fire Apparatus, including pumpers, tankers, aerial ladders and platforms, rescues, industrial apparatus, and aircraft-rescue-and-firefighting vehicles, and distributes its products through an established dealer network.

26. Ferrara manufactures and sells Fire Apparatus, including custom pumpers, aerial apparatus, rescues, tankers, and other specialty emergency vehicles, through REV's Fire Group distribution and dealer channels.

27. KME manufactures and sells custom Fire Apparatus, including pumpers, aerials, tractor-drawn aerials, rescues, tankers, and specialty vehicles, through REV's Fire Group sales and dealer network.

28. Spartan designs, manufactures, markets, and sells custom Fire Apparatus, fire-truck chassis, pumpers, aerials, rescues, and other emergency-response vehicles through REV's Fire Group sales and distribution system.

29. Smeal SFA, LLC and Smeal LTC, LLC (collectively, "Smeal") manufacture and sell Fire Apparatus, including aerial ladders, aerial platforms, pumpers, and related specialty apparatus, and operate as part of REV's Fire Group and its nationwide sales and distribution system.

30. Detroit Truck Manufacturing, LLC ("DTM") was launched by Spartan in 2019 as a captive supplier of fabricated aluminum cabs for Spartan fire trucks and as a supplier of cabs and chassis used by other fire-apparatus manufacturers. DTM supplied components for Spartan's fire-apparatus operations and for the cab-and-chassis products Spartan sold to numerous original-equipment fire-truck manufacturers. In February 2020, REV Group acquired DTM as part of its acquisition of Spartan's emergency-response business, thereby incorporating DTM's fire-

apparatus cab and chassis manufacturing operations into REV Group's fire and emergency vehicle business.

31. Rosenbauer America, LLC ("Rosenbauer America") is a United States fire-apparatus manufacturer and the parent or coordinating entity for Rosenbauer's American manufacturing operations.

32. Rosenbauer America manufactures and sells a broad line of Fire Apparatus, including custom and commercial pumpers, heavy rescues, tankers and tenders, aerial ladders and platforms, specialty emergency vehicles, and electric fire trucks, through affiliated manufacturing entities and a nationwide dealer and distribution network.

33. Rosenbauer America represents that its United States operations constitute a complete fire-apparatus manufacturing platform and coordinates the marketing and sale of Rosenbauer-branded apparatus throughout the United States.

34. Rosenbauer South Dakota, LLC ("Rosenbauer South Dakota") is a Rosenbauer America subsidiary headquartered at 100 Third Street, Lyons, South Dakota. Rosenbauer South Dakota traces its operations to Central States Fire Apparatus and manufactures Fire Apparatus, including pumpers, rescue vehicles, tankers, tenders, and other custom firefighting vehicles.

35. Rosenbauer South Dakota manufactures hundreds of firefighting vehicles annually at its Lyons facility and sells Rosenbauer-branded Fire Apparatus to governmental and other purchasers throughout the United States through Rosenbauer's dealer and cooperative-purchasing channels.

36. Rosenbauer Minnesota, LLC ("Rosenbauer Minnesota") is a Rosenbauer America subsidiary headquartered at 5181 260th Street, Wyoming, Minnesota.

37. Rosenbauer Minnesota traces its operations to General Safety Equipment and manufactures Fire Apparatus and related equipment, including municipal fire trucks, pumps, aerial rescue apparatus, specialized industrial firefighting vehicles, and PANTHER airport rescue and firefighting vehicles.

38. Rosenbauer Minnesota sells Rosenbauer-branded Fire Apparatus to governmental and other purchasers throughout the United States through Rosenbauer's dealer and cooperative-purchasing channels.

39. Rosenbauer America, Rosenbauer South Dakota, and Rosenbauer Minnesota operate as an integrated Rosenbauer fire-apparatus enterprise in the United States.

40. Rosenbauer's own materials identify Rosenbauer America, LLC as contracting through or doing business through Rosenbauer South Dakota and Rosenbauer Minnesota, including in connection with cooperative-purchasing contracts, and market the entities collectively under the Rosenbauer America name.[3]

**C. Private Equity Defendants**

41. Defendant AIP, LLC ("AIP"), doing business as American Industrial Partners, is a Delaware limited liability company with its principal place of business at 450 Lexington Avenue, 40th Floor, New York, New York 10017.

42. AIP is a private-equity firm focused on investments in middle-market manufacturing and industrial businesses.

43. AIP sponsored, managed, and exercised control over the investment vehicles through which it acquired and controlled REV Group and its predecessor entities.

---

[3] Accordingly, references herein to "Rosenbauer" include Rosenbauer America, Rosenbauer South Dakota, and Rosenbauer Minnesota unless otherwise indicated.

44. Through its affiliated investment funds, general-partner entities, managing-member entities, and personnel, AIP participated in the ownership, management, governance, and strategic direction of REV Group and its Fire Apparatus businesses.

45. Defendant American Industrial Partners Capital Fund IV, LP ("AIP Fund IV") is a Delaware limited partnership whose principal business office is located at 450 Lexington Avenue, 40th Floor, New York, New York 10017.

46. AIP Fund IV is an investment fund sponsored and managed by AIP.

47. AIP Fund IV acquired and held an ownership interest in REV Group and/or its predecessor and constituent entities beginning at least as early as 2008 and continuing until approximately March 2024.

48. AIP CF IV served as AIP Fund IV's general partner and exercised management authority over the Fund on behalf of AIP.

49. Defendant American Industrial Partners Capital Fund IV (Parallel), LP ("AIP Parallel Fund") is a Delaware limited partnership whose principal business office is located at 450 Lexington Avenue, 40th Floor, New York, New York 10017.

50. AIP Parallel Fund is an investment vehicle affiliated with, sponsored by, and managed by AIP and operated in parallel with AIP Fund IV.

51. AIP Parallel Fund held an ownership interest in REV Group and/or its predecessor and constituent entities from at least 2008 until approximately March 2024.

52. AIP CF IV served as the general partner of AIP Parallel Fund and exercised management authority over it on behalf of AIP.

53. Defendant AIP/CHC Holdings, LLC ("AIP Holdings") is a Delaware limited liability company whose principal business office is located at 450 Lexington Avenue, 40th Floor, New York, New York 10017.

54. AIP Holdings is an AIP-affiliated investment vehicle that held an ownership interest in REV Group and/or its predecessor or constituent entities.

55. Together with AIP Fund IV and AIP Parallel Fund, AIP Holdings comprised the principal AIP investment vehicles through which AIP owned a substantial equity interest in, and exercised influence and control over, REV Group.

56. AIP/CHC Investors served as the managing member of AIP Holdings.

57. Defendant AIP CF IV, LLC ("AIP CF IV") is a Delaware limited liability company affiliated with American Industrial Partners and having its principal business office at 450 Lexington Avenue, 40th Floor, New York, New York 10017.

58. AIP CF IV is the general partner of both AIP Fund IV and AIP Parallel Fund and was responsible for the management and control of those investment vehicles.

59. Through that role, AIP CF IV exercised voting, dispositive, governance, and other management authorities with respect to the AIP Funds' investments in REV Group and acted on behalf of AIP Fund IV and AIP Parallel Fund in matters concerning their REV Group ownership.

60. Defendant AIP/CHC Investors, LLC ("AIP/CHC Investors") is a Delaware limited liability company affiliated with American Industrial Partners and having its principal business office at 450 Lexington Avenue, 40th Floor, New York, New York 10017.

61. AIP/CHC Investors served as the managing member of AIP Holdings and was responsible for the management and control of that AIP investment vehicle.

62. Through its management of AIP Holdings, AIP/CHC Investors exercised governance, voting, dispositive, and other authorities with respect to AIP Holdings' investment in REV Group and acted on behalf of AIP Holdings in matters concerning that investment.[4]

63. The AIP Defendants operated through the same New York-based American Industrial Partners organization and overlapping ownership, management, governance, and personnel. Through that structure, the AIP Defendants participated in and exercised control over the investment vehicles through which REV Group and its predecessor Fire Apparatus businesses were acquired, consolidated, managed, and operated.

**D. Agents and Co-Conspirators**

64. Defendants acted through their officers, directors, employees, agents, subsidiaries, affiliates, dealers, distributors, and other co-conspirators.

65. The acts of each co-conspirator in furtherance of the conspiracy are attributable to the other participants in the conspiracy.

66. Various persons and entities not presently named as defendants participated as co-conspirators or facilitators.

67. References to a corporate Defendant include its predecessors, successors, assigns, parents, controlled subsidiaries, and agents to the extent they participated in, controlled, ratified, or benefited from the conduct alleged.

---

[4] AIP, AIP Fund IV, AIP Parallel Fund, AIP Holdings, AIP CF IV, and AIP/CHC Investors are referred to collectively herein as the "AIP Defendants."

## III. JURISDICTION AND VENUE

68. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because Lynbrook seeks declaratory and injunctive relief for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

69. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed Classes contains at least 100 members, the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, and at least one Class member is a citizen of a state different from at least one Defendant.

70. This Court has supplemental jurisdiction over Lynbrook's New York-law claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as the federal antitrust claims.

71. Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because multiple Defendants reside, transact business, or maintain substantial operations in Wisconsin; material conduct relating to REV Group and Pierce occurred in Wisconsin; and the related multidistrict litigation is pending in this District.

72. This Court has personal jurisdiction over Defendants because each transacts substantial business in the United States and purposefully directed sales and anticompetitive conduct toward customers throughout the United States, including municipal purchasers; several Defendants are headquartered or operate in Wisconsin; and the claims arise from nationwide conduct with substantial effects in this District and New York.

73. Pursuant to New York General Business Law § 340(5), Lynbrook, as a New York political subdivision, will serve notice of its intention to commence its Donnelly Act claim upon the New York Attorney General at least ten days before commencement.

## IV. LYNBROOK'S TRANSACTIONS

74. On August 19, 2019, the Lynbrook Board of Trustees awarded a bid for a replacement Fire Department pumper for its Tally-Ho Engine Company to Hendrickson Fire Rescue Equipment, Inc., doing business as Fire Rescue Equipment ("Hendrickson") for a Spartan pumper in the amount of $739,996.

75. The Village contracted with and paid Hendrickson for that Fire Apparatus.

76. Hendrickson is a Long Island Fire Apparatus dealer with headquarters in Islandia, New York.

77. Hendrickson holds itself out as an authorized representative of multiple REV Group Fire Apparatus brands, including Spartan, Ferrara, and E-ONE.

78. E-ONE identifies Hendrickson as its dealer for Long Island.

79. Ferrara likewise identifies Hendrickson as an authorized dealer covering Nassau County and other New York territories.

80. Hendrickson thus serves as the local distribution intermediary through which REV Group-branded Fire Apparatus are marketed and sold to purchasers such as Lynbrook.

81. The manufacturer-dealer relationship is not incidental to Lynbrook's purchase.

82. The 2019 Fire Apparatus was expressly specified and awarded as a Spartan pumper, while Hendrickson was the contracting dealer.

83. Spartan supplied the branded Fire Apparatus and Hendrickson served as the intermediary through which the Village purchased it.

84. The manufacturer-level price, options, surcharges, production costs, and other pricing decisions attributable to Spartan and REV Group were necessary to be substantial components of the price quoted to and paid by Lynbrook.

85. Public records likewise establish that, on January 23, 2023, the Lynbrook Board of Trustees received a bid for a "Pierce 100 Heavy Duty Aerial Ladder Truck or Equal" and awarded the contract to Firematic Supply Co., Inc. ("Firematic")[5] for $1,489,000.

86. Firematic markets and sells Pierce pumpers, aerials, rescues, tankers, and related apparatus to municipal customers and provides associated parts and service support.

87. Accordingly, the 2023 transaction reflects the same economic distribution structure as Lynbrook's Hendrickson transaction: the Manufacturer Defendant controlled the branded apparatus, production, base pricing, specifications, and material manufacturer-level price components, while an authorized territorial dealer submitted the municipal bid and received the purchase award.

88. Lynbrook paid the dealer price, which incorporated and passed through the upstream manufacturer-level price and any supracompetitive overcharge embedded in that price.

89. The supracompetitive manufacturer-level overcharges alleged herein were incorporated into and passed through the prices paid by Lynbrook.

90. Fire Apparatus dealer arrangements are structured around manufacturer brands, exclusive or designated territories, manufacturer specifications, and/or manufacturer-controlled production schedules.

91. Following Firematic's acquisition of Churchville, Firematic became the Pierce distribution channel for Pierce Fire Apparatus throughout New York.

---

[5] Firematic, located in East Yaphank, New York, is an authorized Pierce dealer and distributor through which Pierce markets, sells, and delivers to and services Pierce Fire Apparatus municipal purchasers in New York. Pierce itself identifies Firematic as a Pierce dealer and lists Firematic as part of its authorized dealer network.

92. Firematic identifies personnel responsible for Pierce apparatus sales in specific New York regions and counties, including personnel serving Nassau and Suffolk Counties and other portions of New York. Its operations include Fire Apparatus sales, specification assistance, service coordination, parts, and post-sale support.

93. Pierce also participates in cooperative-purchasing programs through which municipalities may procure Fire Apparatus.

94. Pierce's current Sourcewell cooperative-purchasing contract covers custom and commercial Fire Apparatus, including aerials, pumpers, rescues, tankers, and stock units.

95. Significantly, Sourcewell[6] directs participating purchasers seeking Pierce products to "Locate your local dealer or representative" and states that products are available through the Pierce Dealer Network.[7]

96. Accordingly, whether a New York municipality procured Pierce apparatus through an individually solicited bid, negotiated procurement, or an available cooperative-

---

[6] Sourcewell is a Minnesota governmental entity that operates a nationwide cooperative-purchasing program for public agencies. It conducts competitive solicitations and awards master contracts that participating municipalities and other governmental entities may use to purchase goods and services, including fire apparatus, subject to applicable state and local procurement requirements. Sourcewell maintains cooperative contracts for fire apparatus with major manufacturers in the market, including Pierce, REV Group-affiliated manufacturers, and Rosenbauer. Participating agencies may purchase under those contracts directly from the awarded supplier or through an authorized local dealer, with the Sourcewell contract supplying the competitively solicited pricing framework, discounts, terms, and conditions for the transaction. *See* Sourcewell, *How Cooperative Purchasing Works*, https://www.sourcewell-mn.gov/cooperative-purchasing/how-it-works; Sourcewell, *Firefighting Apparatus and Fire Service Vehicles Solicitation No. 11177*, https://www.sourcewell-mn.gov/solicitations/11177; Sourcewell, *Pierce Manufacturing, Inc., Contract No. 082025-PMI*, https://www.sourcewell-mn.gov/cooperative-purchasing/082025-pmi.

[7] *See* Sourcewell, *Pierce Manufacturing Inc., Contract No. 082025-PMI*, https://www.sourcewell-mn.gov/cooperative-purchasing/082025-pmi (covering custom and commercial fire apparatus, including aerials, pumpers, rescues, tankers, and stock units, and directing participating purchasers to "[l]ocate your local dealer or representative" through the Pierce Dealer Network).

purchasing vehicle, the authorized Pierce dealer network provided the mechanism through which Pierce Fire Apparatus was quoted, configured, sold, delivered, and serviced.

97. In New York, that distribution function was performed by Firematic within the geographic territory assigned or recognized by Pierce.

98. The relationship between Oshkosh, Pierce, and Firematic therefore formed a vertically integrated commercial distribution structure for purposes of the sale of Pierce Fire Apparatus in New York:

a. Oshkosh owned and controlled Pierce;

b. Pierce manufactured the apparatus and maintained its authorized dealer network and geographic dealer territory; and

c. Firematic served as Pierce's authorized New York distribution and sales channel.

99. This territorial distribution structure materially limited competition for Pierce Fire Apparatus.

100. A municipality seeking Pierce Fire Apparatus could not obtain meaningful price competition by soliciting competing authorized Pierce dealers located in different parts of New York because Pierce allocated geographic territory among its authorized dealers and, ultimately, Firematic is its sole dealer for the entire State.

101. The absence of intrabrand dealer competition is particularly significant in the Fire Apparatus market because fire engines and related apparatus are highly customized products, purchases are infrequent and extremely costly, manufacturers are few, delivery lead times can extend for substantial periods, and municipalities often specify a particular manufacturer, chassis, configuration, or equipment package before soliciting quotations or bids.

102. Under those circumstances, territorial dealer restrictions reduced an additional potential source of competitive pressure on Fire Apparatus prices.

103. These arrangements also facilitated implementation of manufacturer price increases.

104. When Pierce increased the manufacturer's price of Fire Apparatus, chassis, component, option, or other equipment, New York purchasers could not evade that increase by obtaining the same Pierce Fire Apparatus from another competing Pierce dealer within New York.

105. Firematic's statewide territorial position enabled manufacturer-level pricing decisions to flow through a single authorized distribution channel to New York municipal purchasers.

106. The structure and operation of the Pierce dealer network—including defined geographic territories, the absence of competing Pierce dealers within Firematic's New York territory, manufacturer-dealer communications, and use of that dealer network for direct and cooperative procurements—provided a mechanism through which Pierce pricing policies and price increases would be transmitted to municipal purchasers with substantially diminished intrabrand competitive constraint.

107. This arrangement must also be viewed in the context of the highly concentrated Fire Apparatus market alleged herein.

108. Geographic dealer restrictions maintained by the Manufacturer Defendants, reinforced barriers to price competition by preventing municipalities from generating competition not only among manufacturers, but also among multiple distributors of the same manufacturer's Fire Apparatus.

109. In combination with the other conduct alleged herein, these practices contributed to the ability of Defendants to raise, maintain, and stabilize Fire Apparatus prices at supracompetitive levels.

## V. THE FIRE APPARATUS MARKET

110. Fire Apparatus are specialized, mission-critical vehicles designed to transport personnel and equipment and support fire suppression, rescue, disaster response, and mitigation of hazardous conditions. They include structural pumpers, aerials, quints, tankers, rescues, wildland apparatus, and related specialty vehicles.

111. Fire Apparatus have long useful lives but must be replaced periodically to maintain operational readiness and safety. Municipal purchasers cannot readily substitute ordinary commercial trucks for custom Fire Apparatus, and they cannot indefinitely defer purchases without increasing operational and public-safety risks.

112. The relevant product market is the United States market for Fire Apparatus.

113. A hypothetical monopolist in these markets could profitably impose a small but significant and non-transitory increase in price because purchasers lack reasonably interchangeable substitutes.

114. The relevant geographic market is the United States and respecting the New York claims, New York.

115. Manufacturer Defendants sell nationally through corporate sales forces, dealers, governmental procurement programs, and cooperative purchasing organizations.

116. Barriers to entry are high.

117. A viable entrant must develop specialized engineering and manufacturing capacity, comply with NFPA[8] and governmental safety requirements, establish supplier relationships, build a dealer and service network, develop brand credibility with risk-averse municipal purchasers, and finance long production cycles.[9]

118. Demand is highly inelastic.

119. Fire departments require dependable emergency vehicles to protect life and property.

120. Municipal purchasers therefore must continue purchasing even when prices rise and delivery times are lengthened.

## VI. CONSOLIDATION AND REDUCTION OF INDEPENDENT COMPETITION

121. Beginning before the Class Period and continuing into it, AIP and REV Group pursued a serial acquisition strategy that combined formerly independent Fire Apparatus

---

[8] NFPA" refers to the **National Fire Protection Association**, a nonprofit standards-development organization that publishes nationally recognized consensus codes and standards governing fire protection, life safety, and emergency-response equipment, including standards applicable to automotive fire apparatus. *See* National Fire Protection Association, *About NFPA*, https://www.nfpa.org/about-nfpa.

[9] Examples include compliance with applicable **NFPA fire-apparatus standards**, federal motor-vehicle safety standards, and state and local public-procurement requirements. NFPA 1900 establishes minimum requirements governing the design, performance, and testing of automotive fire apparatus. *See* National Fire Protection Association, *NFPA 1900, Standard for Aircraft Rescue and Firefighting Vehicles, Automotive Fire Apparatus, Wildland Fire Apparatus, and Automotive Ambulances*. Federal Motor Vehicle Safety Standards also apply to fire trucks where the particular standard encompasses the vehicle or component at issue. *See, e.g.*, 49 C.F.R. pt. 571; Nat'l Highway Traffic Safety Admin., Interpretation No. nht91-7.1 (Nov. 7, 1991) (explaining that FMVSS No. 206 applies to fire trucks and that fire trucks are not categorically excluded from the standard). In New York, municipal purchases are also subject to public-procurement requirements, including N.Y. Gen. Mun. Law § 103, which generally requires purchase contracts exceeding $20,000 to be awarded pursuant to competitive bidding, subject to statutory exceptions. See N.Y. Office of the State Comptroller, *Procurement Rules for Local Governments and School Districts* (2024).

manufacturers under common control. These acquisitions included E-ONE, KME, Ferrara, Spartan Emergency Response, Smeal, and related businesses.

122. KME, Ferrara, Spartan, and the other acquired brands had previously competed independently for municipal business.

123. Their consolidation eliminated actual or potential head-to-head competition and enabled REV Group to coordinate pricing, production, product platforms, dealer territories, and margin initiatives across brands.

124. REV Group publicly described itself as an industry consolidator and pursued common designs and center-led management across its Fire Apparatus brands. It reduced geographic overlap and sought to prevent aggressive competition among affiliated brands and dealers.

125. Oshkosh/Pierce expanded through acquisitions and partnerships, including a minority ownership interest and collaboration with Boise Mobile Equipment, Inc. and acquisition of Maxi-Metal, Inc. while its dealer network consolidated territory through transactions involving regional Pierce dealers.[10]

---

[10] *See* Pierce Manufacturing Inc., *Pierce Manufacturing Completes Ownership Interest in Boise Mobile Equipment* (Sept. 16, 2021), https://www.piercemfg.com/pierce/press-release/pierce-manufacturing-completes-ownership-interest-in-boise-mobile-equipment (announcing Pierce's purchase of an ownership interest in Boise Mobile Equipment ("BME") and stating that the investment would facilitate greater collaboration in the wildland market and support BME's transition to an independent-dealer distribution model); Oshkosh Corp., *Oshkosh Corporation Acquires Maxi-Métal Inc.* (June 13, 2022), https://www.oshkoshcorp.com/news/2022/6-13-22-maxi-metal (announcing Oshkosh's acquisition of Maxi-Métal and stating that the transaction would expand collaboration and sales and distribution capabilities through Pierce's North American dealer network); Pierce Manufacturing Inc., *Leading Pierce Dealerships Take On New Territories in New York and Pennsylvania* (June 23, 2015), https://www.piercemfg.com/pierce/press-release/leading-pierce-dealerships-take-on-new-territories (announcing expansion of the assigned dealer territories of Churchville Fire Equipment, Firematic Supply Company, and Glick Fire Equipment); Pierce Manufacturing Inc., *Pierce Dealer Firematic Supply Co. Grows Presence in Northeast with Acquisition of Churchville Fire Equipment* (2023), https://www.piercemfg.com/pierce/press-release/pierce-dealer-firematic-supply-co.-grows-presence-in-

126. Rosenbauer uses exclusive or non-overlapping dealer territories. Exclusive geographic arrangements, while not unlawful standing alone, contribute to the market structure alleged here by reducing intrabrand price rivalry and making manufacturer-level coordination more effective.[11]

127. The cumulative effect of these acquisitions and distribution arrangements was a market with fewer independent manufacturers, fewer independent bidding alternatives, increased barriers to entry, and greater ability for the remaining major manufacturers to coordinate or accommodate one another.

## VII. INFORMATION EXCHANGE, COORDINATION, AND PLUS FACTORS

128. The Manufacturer Defendants are active participants in the Fire Apparatus Manufacturers' Association ("FAMA"), an industry trade association whose members include major competing Fire Apparatus manufacturers.[12]

---

northeast-with-acquisition-of-churchville-fire-equipment (describing Firematic's acquisition of Churchville and the consolidation of their Pierce sales and service territories).

[11] *See LAFD Purchases Rosenbauer Electric Apparatus*, **Firehouse** (Feb. 10, 2020) (identifying Velocity Fire Equipment as Rosenbauer's "exclusive dealer for sales and service in southern California, Arizona, and southern Nevada"), https://www.firehouse.com/apparatus/press-release/21124983/; Rosenbauer America, *Rosenbauer America Announces MES-New Mexico as Authorized Dealer for the State of New Mexico* (Mar. 24, 2026) (appointing one statewide dealer following a "transition in the region's dealer representation"), https://www.rosenbauer.com/en-us/news/news-hub/specialist-press/2026/03/mes-new-mexico-as-authorized-dealer; *Rosenbauer America Announces Territory Expansion with C.W. Williams to Include South Carolina*, **FireRescue1** (June 23, 2025) (describing the expansion of C.W. Williams's "authorized dealer territory" from North Carolina to South Carolina), https://www.firerescue1.com/fire-products/fire-apparatus/rosenbauer-america-announces-territory-expansion-with-c-w-williams-to-include-south-carolina.

[12] *See* Fire Apparatus Manufacturers' Association , *Member List*, https://www.fama.org/members/list/ (listing, among others, Pierce and Rosenbauer as FAMA members); FAMA, *Membership Business Meeting Minutes* (Oct. 16, 2024), https://www.fama.org/wp-content/uploads/2025/03/1741973694_67d468be5cbda.pdf (identifying participating member companies including Pierce, Rosenbauer E-ONE, KME, and Spartan Emergency Response); FAMA, *FAMA Releases Fire Apparatus Industry Update* (June 17, 2025), https://www.fama.org/fama-releases-fire-apparatus-industry-update/ (describing FAMA as a nonprofit trade association whose approximately 135 member

129. FAMA's Data and Research Committee collects and distributes detailed apparatus sales, order, backlog, market-share, product-category, geographic, forecasting, and other commercially sensitive information. Access is restricted to participating members and is not generally available to municipal purchasers.

130. FAMA also organizes recurring meetings, roundtables, committees, and member discussions where competitors have opportunities to discuss market conditions, industry outlook, bookings, shipments, purchasing considerations, and industry statistics.[13]

131. In addition to their contacts through FAMA, the Manufacturer Defendants and their authorized dealers regularly participated in regional apparatus demonstrations, dealer-hosted showcases, road rallies, trade shows, industry meetings, and similar events that brought competing manufacturers, dealers, sales personnel, and other industry participants into recurring direct contact.[14]

---

companies include approximately 55 manufacturers of fire apparatus and associated emergency-response vehicles).

[13] *See* Fire Apparatus Manufacturers' Association, *Meeting Planning Committee*, https://www.fama.org/meeting-planning/ (explaining that FAMA conducts recurring Spring and Fall General Membership Meetings and develops programs and topics for those meetings); FAMA, *Data & Research Committee*, https://www.fama.org/statistics/ (stating that the Committee provides members with economic data, fire-market trends, and apparatus sales and order statistics for strategic business planning and collects and distributes apparatus sales and order data); FAMA, *Fall General Membership Meeting Minutes* (Oct. 9–10, 2019), https://www.fama.org/wp-content/uploads/2021/11/1636465451_618a7b2bcf7ef.pdf (reflecting presentations to members concerning North American apparatus bookings, shipments, quarterly sales, product-type sales, chassis mix, industry outlook, and purchasing-cycle considerations); FAMA, *Fall General Membership Meeting Minutes* (Oct. 6, 2020), https://www.fama.org/wp-content/uploads/2021/11/1636465322_618a7aaa3866d.pdf (reporting member presentations concerning industry bookings, shipments, sales, and product-specific market data). FAMA states that its statistical programs use historical data compiled in composite form and are intended to comply with federal antitrust laws.

[14] *See* Pierce Manufacturing Inc., *Road Rally*, https://www.piercemfg.com/road-rally (describing dealer-supported regional events offering hands-on apparatus demonstrations and interaction with prospective purchasers); Pierce Manufacturing Inc., *Pierce Manufacturing Hits the Road with 2026 Road Rally, Showcasing Advanced Fire Apparatus and Technology* (Apr. 21, 2026),

132. These events provided additional opportunities for industry participants to exchange information concerning market conditions, customer demand, product developments, delivery conditions, purchasing trends, and other matters affecting the Fire Apparatus market.

133. Competitor information exchanges can facilitate coordination in a concentrated market, particularly where the information concerns price, output, sales, orders, backlogs, costs, market share, or strategic planning and is sufficiently current or granular to permit competitors to monitor one another.

134. Here, the information exchanges occurred against a background of high concentration, repeated interaction, inelastic demand, high barriers to entry, parallel price increases, parallel refusal to expand sufficient capacity despite record backlogs, and public statements celebrating backlog and margin growth.

135. The Manufacturer Defendants submitted strikingly similar pricing structures to governmental cooperative purchasing programs. In multiple solicitations, major competing manufacturers utilized uniform percentage-discount-from-list-price or MSRP methodologies, reducing the expected benefit of competitive procurement and making pricing ostensibly competitive dependent upon manufacturer-controlled list prices.[15]

---

https://www.piercemfg.com/pierce/press-release/pierce-manufacturing-hits-the-road-with-2026-road-rally-showcasing-advanced-fire-apparatus-and-technology (stating that each Road Rally event is hosted in partnership with an authorized Pierce dealer); Fire Apparatus & Emergency Equipment, *FDIC International 2019: Making the Connection* (Apr. 2019) (describing Pierce's participation with representatives from its dealer network and opportunities for attendees to interact with apparatus manufacturers, dealers, and service personnel); Fire Apparatus Manufacturers' Association, *About FAMA*, https://www.fama.org/ (promoting member meetings and opportunities to build industry relationships and remain informed concerning industry trends).

[15] *See* Sourcewell, *Comment and Review—Fire Apparatus, RFP No. 113021* (Feb. 7, 2022), https://files.sourcewell.org/public/Shared%20Documents/Solicitations/10462/Solicitation%20Documents/Comment%20and%20Review-Fire%20Apparatus%20113021.pdf (describing competing proposals from Oshkosh/Pierce, REV Group/E-ONE, and Rosenbauer as offering discounts from list price or MSRP); Oshkosh/Pierce, *Sourcewell Contract No. 113021-PMI Product & Price Listing* (2022),

136. These facts, considered together, plausibly support an inference of concerted action to raise, maintain, or stabilize prices and restrict output, rather than independent competition on price and production.

## VIII. OUTPUT RESTRICTION, BACKLOGS, AND FLOATING PRICES

137. After Fire Apparatus demand recovered from the financial crisis and increased substantially, competitive manufacturers ordinarily would have expanded output and capacity to capture sales from rivals.

138. The Manufacturers Defendants did not respond in that ordinary competitive manner.

139. REV Group reported multibillion-dollar backlogs that grew dramatically during the Class Period.[16]

---

https://public.destinyhosted.com/flagsdocs/2022/CCMTG/20220419_3482/6420_Exhibit_B_-_Agency_Contract_Pricing.pdf (providing a uniform 5.5% discount from Pierce list/MSRP pricing for base apparatus and options); Sourcewell, *REV Group Contract No. 113021*, https://files.sourcewell.org/public/Shared%20Documents/Solicitations/10462/00004196/Contract%20Documents/Rev%20Group%20Contract%20113021.pdf (reflecting REV Group's participation through E-ONE, Ferrara, KME, and Spartan and its cooperative-purchasing pricing structure); Sourcewell, *Comment and Review—Firefighting Apparatus, RFP No. 082025* (2025), https://files.sourcewell.org/public/Shared%20Documents/Solicitations/11177/Solicitation%20Documents/Comment%20and%20Review-Firefighting%20Apparatus%20082025.pdf (again describing REV Group and Rosenbauer proposals as providing participating entities discounts from list or market price). See also Rosenbauer South Dakota, LLC, Delaware Contract No. 8200028187, https://bidcondocs.delaware.gov/GSS/GSS_18742-FIRE_APP_pl1.pdf (applying a uniform 15% discount from stated retail prices across numerous categories of fire apparatus and available options).

[16] *See* REV Group, Inc., Annual Report (Form 10-K) for fiscal year ended Oct. 31, 2022, https://www.sec.gov/Archives/edgar/data/1687221/000095017022026493/revg-20221031.htm (reporting Fire & Emergency segment backlog of approximately $2.589 billion at Oct. 31, 2022, up from approximately $1.499 billion at Oct. 31, 2021, an increase of 72.8%); REV Group, Inc., 2023 Fourth Quarter Results, https://www.sec.gov/Archives/edgar/data/1687221/000095017023069875/revg-ex99_1.htm (reporting Fire & Emergency backlog of approximately $3.650 billion at Oct. 31, 2023, up another 41% from fiscal 2022); REV Group, Inc., Annual Report (Form 10-K) for fiscal year ended Oct. 31, 2024, https://www.sec.gov/Archives/edgar/data/1687221/000095017024135208/revg-20241031.htm (reporting total backlog of approximately $4.471 billion and attributing growth in its Specialty Vehicles segment principally to continued demand and order intake for fire apparatus and ambulances, together with pricing actions); REV Group, Inc., Annual Report (Form 10-K) for fiscal year ended Oct. 31, 2025,

140. Oshkosh and Rosenbauer likewise reported substantial and growing backlogs.

141. Lead times increased from roughly 12–18 months in earlier periods to multiple years, and in some instances approximately four years or more.[17]

142. Despite persistent demand and rising prices, the Manufacturer Defendants failed to expand capacity sufficiently and, in some instances, reduced it.

143. REV Group closed KME production facilities in Pennsylvania and Virginia and shifted production to other REV facilities, a restructuring that REV acknowledged resulted in production inefficiencies.[18]

---

https://www.sec.gov/Archives/edgar/data/1687221/000119312525313470/revg-20251031.htm (reporting Specialty Vehicles backlog of approximately $4.402 billion and total backlog of approximately $4.635 billion, and again attributing the increase principally to continued demand and order intake for fire apparatus and ambulance units and pricing actions).

[17] *See* Oshkosh Corp., Annual Report (Form 10-K) for year ended Dec. 31, 2022 (reporting that Fire & Emergency segment backlog increased 85.4%, from approximately $1.5 billion at year-end 2021 to approximately $2.9 billion at year-end 2022, due to strong demand for fire trucks); Oshkosh Corp., Annual Report (Form 10-K) for year ended Dec. 31, 2023, https://www.sec.gov/Archives/edgar/data/775158/000095017024022841/osk-20231231.htm (reporting fire-apparatus backlog of approximately $4.0 billion at Dec. 31, 2023, up 42.1% from approximately $2.8 billion at Dec. 31, 2022); Oshkosh Corp., Quarterly Report (Form 10-Q) for quarter ended June 30, 2024, https://www.sec.gov/Archives/edgar/data/775158/000095017024088482/osk-20240630.htm (stating that "[b]acklog for Pierce fire trucks continues to grow"); Rosenbauer International AG, *Annual Report 2024—Economic Development*, https://bericht.rosenbauer.com/2024/en/annual-report/economic-development/ (reporting order backlog of approximately €2.280 billion at Dec. 31, 2024, compared with approximately €1.788 billion at Dec. 31, 2023, and record 2024 order intake of approximately €1.705 billion). See also City of Alameda, Cal., Staff Report, File No. 2025-4960 (2025), https://alameda.legistar.com/LegislationDetail.aspx?FullText=1&GUID=712E44DD-6AF5-4362-8B22-A644EEC9EF7B&ID=7353631 (reporting current fire-apparatus delivery lead times of approximately 45–48 months); City of Stockton, Cal., Staff Report, File No. 25-0149 (2025), https://stockton.legistar.com/LegislationDetail.aspx?GUID=A1BD800E-E910-4BB9-A648-7AD52455655D&ID=7149986 (reporting then-current Pierce lead times of approximately 35 months for fire engines and 48 months for tiller trucks); International Association of Fire Fighters, *What to Know About the Fire Truck Crisis* (2026), https://www.iaff.org/news/what-to-know-about-the-fire-truck-crisis/ (reporting that delivery commonly takes two to four years, with some apparatus quoted at up to approximately four-and-one-half years, compared with historical delivery periods of approximately 18 months).

[18] *See* REV Group, Inc., Annual Report (Form 10-K) for fiscal year ended Oct. 31, 2021, https://www.sec.gov/Archives/edgar/data/1687221/000156459021060365/revg-10k_20211031.htm

144. Long backlogs reduced the practical ability of purchasers to switch suppliers.

145. A municipality that had already budgeted, specified, bid, and ordered an apparatus faced severe costs and public-safety risks if it cancelled and restarted a multi-year procurement process with another manufacturer.

146. The Manufacturer Defendants exploited the resulting leverage through "floating price" clauses, surcharges, and post-order price adjustments that permitted prices to rise during lengthy production periods.

147. These practices increased final transaction prices paid by municipal purchasers, including indirect purchasers whose dealers passed through manufacturer-level price increases and surcharges.

## IX. SUPRACOMPETITIVE PRICES AND PASS-THROUGH TO LYNBROOK

148. Fire Apparatus prices rose far faster than inflation and relevant producer-price measures during the Class Period.[19]

---

(announcing that REV Group would close its KME production facilities in Nesquehoning, Pennsylvania and Roanoke, Virginia and relocate production to other existing Fire & Emergency segment facilities in the United States); REV Group, Inc., Annual Report (Form 10-K) for fiscal year ended Oct. 31, 2022, https://www.sec.gov/Archives/edgar/data/1687221/000095017022026493/revg-20221031.htm (reporting that production at both KME locations had ceased by April 30, 2022 and that the restructuring generated $9.4 million in restructuring charges and $12.0 million in additional charges, including $8.5 million attributable to production inefficiencies); REV Group, Inc., Annual Report (Form 10-K) for fiscal year ended Oct. 31, 2023, https://www.sec.gov/Archives/edgar/data/1687221/000095017023069876/revg-20231031.htm (confirming closure of the Nesquehoning and Roanoke facilities and relocation of KME production to other REV Group Fire & Emergency facilities); see also REV Group, Inc., Response to SEC Staff Comments (Apr. 2025), https://www.sec.gov/Archives/edgar/data/1687221/000095010325004229/filename1.htm (explaining that relocation of KME production caused production inefficiencies, including increased labor and variable overhead costs and underutilized fixed overhead).

[19] *See* City of Elmhurst, Ill., *Report—Fire Truck Purchase* (2023), [https://go.boarddocs.com/il/coe/Board.nsf/files/CSTTAD765876/*file/Report*file/Report%20-%20Fire%20Truck%20Purchase.pdf) (reporting that fire-apparatus prices had "spiked exponentially since 2021," that the average apparatus cost had increased approximately $100,000 in each of the preceding three years, and that prices for ladders and towers had doubled since 2019); REV Group, Inc., Annual Report (Form 10-K) for fiscal year ended Oct. 31, 2022,

149. Industry examples reflect increases approaching or exceeding 100% for common pumper and ladder apparatus over periods in which comparable manufacturing indices increased far less.[20]

150. The alleged overcharge originated at the manufacturer level.

151. Dealers selling branded custom Fire Apparatus obtain the apparatus from the Manufacturer Defendants and quote the municipality a price that incorporates the manufacturer's apparatus price, options, surcharges, and other manufacturer-controlled components.

152. The Lynbrook transactions provide concrete examples of that pass-through mechanism:

---

https://www.sec.gov/Archives/edgar/data/1687221/000095017022026493/revg-20221031.htm (attributing substantial growth in Fire & Emergency backlog in part to "pricing actions"); International Association of Fire Fighters, *What to Know About the Fire Truck Crisis* (June 8, 2026), https://www.iaff.org/news/what-to-know-about-the-fire-truck-crisis/ (reporting that fire-truck prices had doubled or tripled over approximately five years); Sens. Jim Banks & Elizabeth Warren, *Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing* (2025), https://www.banks.senate.gov/news/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing/ (reporting that pumper prices increased from approximately $500,000 in 2013 to nearly $1 million and ladder-truck prices from approximately $900,000 to approximately $2 million, "far outpacing inflation for heavy duty truck manufacturing," and citing an E-ONE pumper whose price rose from approximately $650,000 in 2021 to more than $1 million in 2024); see also U.S. Bureau of Labor Statistics, *Producer Price Index*, https://www.bls.gov/ppi/ (official producer-price data used to measure changes in selling prices received by domestic producers).

[20] *See* Sens. Elizabeth Warren & Jim Banks, *Letter Regarding Private Equity and Fire Truck Manufacturing* (Apr. 15, 2025), https://www.warren.senate.gov/imo/media/doc/_firefighters.pdf (reporting that a pumper truck costing approximately $500,000 in 2013 had risen to nearly $1 million and that a ladder truck costing approximately $900,000 in 2013 had risen to approximately $2 million, increases the Senators described as "far outpacing inflation for heavy duty truck manufacturing"); Sens. Jim Banks & Elizabeth Warren, *Sens. Banks, Warren Probe Harms of Private Equity in Fire Truck Manufacturing* (Apr. 15, 2025), https://www.banks.senate.gov/news/press-releases/sens-banks-warren-probe-harms-of-private-equity-in-fire-truck-manufacturing/ (same); International Association of Fire Fighters, *What to Know About the Fire Truck Crisis* (June 8, 2026), https://www.iaff.org/news/what-to-know-about-the-fire-truck-crisis/ (reporting that the average price of a new fire engine roughly doubled from approximately $589,000 in 2020 to approximately $1.1 million in 2025, while ladder trucks reached approximately $2 million).

153. For the Spartan pumper, Hendrickson obtained or arranged for the Spartan-branded apparatus from the REV Group distribution system and submitted the bid to Lynbrook.

154. For the Pierce aerial, Firematic obtained or arranged for the Pierce-branded apparatus from the Oshkosh/Pierce distribution system and submitted the bid to Lynbrook.

155. Neither dealer manufactured the custom Fire Apparatus that was the subject of the municipal procurement.

156. Firematic's and Hendrickson's dealer margins were added to or derived from manufacturer-established acquisition prices rather than substituted for them.

157. Thus, an increase in the manufacturer's price increased the dealer's acquisition cost and, absent dealer absorption, increased the municipal bid price dollar-for-dollar or in substantial part.

158. Because Fire Apparatus are high-cost, low-volume, custom products and dealer territories are brand-specific, dealers cannot sustainably absorb large manufacturer overcharges while continuing to perform sales, warranty, service, and delivery obligations.

159. The Manufacturer Defendants also exercised substantial control over the economic terms underlying the dealer sale, including chassis and body pricing, options, component pricing, production slots, delivery schedules, change-order pricing, warranty terms, and surcharges.

160. Those upstream economic terms were incorporated into the bid packages presented by Firematic and Hendrickson and ultimately paid by Lynbrook.[21]

---

[21] Discovery directed to Firematic, Hendrickson, Pierce/Oshkosh, Spartan/REV Group, and their transactional records can establish the exact manufacturer invoice or transfer price, dealer markup, rebates or incentives, surcharges, change orders, and final municipal payment for each Lynbrook purchase. Those records will permit the alleged overcharge and pass-through to be measured without speculation.

161. Because custom Fire Apparatus are expensive, low-volume, made-to-order products and because authorized dealers generally operate within designated territories, dealers lack the economic incentive or practical ability to absorb sustained manufacturer-level overcharges.

162. Those overcharges are therefore passed through in substantial part to municipal purchasers.

163. Lynbrook's 2019 pumper purchases and 2023 aerial purchase occurred during the alleged conspiracy and in the same market affected by Defendants' output restrictions, pricing coordination, backlogs, and information exchanges.

164. But for Defendants' conduct, the prices charged at the manufacturer level would have been lower, dealer acquisition costs and quoted prices would have been lower, and Lynbrook would have paid less for its Fire Apparatus.

165. The amount of pass-through and overcharge can be established with common economic evidence, including manufacturer transaction data, dealer invoices, cooperative-purchasing data, bid records, cost and margin data, and regression or benchmark analyses.

166. Individualized proof is not required to establish the existence of a market-wide overcharge or an economically measurable pass-through methodology.

## X. GEOGRAPHIC PRICING, DEALER TERRITORIES, AND NEW YORK PURCHASERS

167. The Manufacturer Defendants and their authorized dealers use geographic territories, state-specific dealer assignments, customer-location rules, cooperative-purchasing schedules, or other pricing and distribution mechanisms that may cause substantially similar Fire Apparatus to be quoted at different prices depending in part on the purchaser's location.

168. These practices in a concentrated market with restricted dealer territories, location-based pricing can insulate a municipality from lower-priced offers available through dealers serving adjacent states.

169. Public procurement records provide circumstantial evidence of potentially material geographic price disparities in sales of Pierce aerial apparatus through Firematic, the same authorized dealer that sold Lynbrook its 2023 Pierce 100-foot Heavy Duty Aerial Ladder Truck for $1,489,000.

170. For example, Firematic contracted to sell Wilton, Connecticut a Pierce Arrow XT 105-foot aerial for $1,447,767.

171. Although specifications, chassis, options, payment terms, and order dates must be normalized before any definitive comparison can be made, the Wilton transaction demonstrates that a substantially similar Pierce aerial sold through the same dealer could carry a lower headline price outside New York.[22]

172. Other public records likewise show substantial dispersion in Firematic/Pierce aerial pricing. [23]

---

[22] *See* Town of Wilton, Conn., *Contract with Firematic Supply Co., Inc.* (2022), https://www.wiltonct.gov/sites/g/files/vyhlif10026/f/agendas/wilton_contract_.pdf (reflecting Firematic Supply Co., Inc.'s agreement to sell Wilton one new Pierce Arrow XT 105-foot aerial for $1,447,767 pursuant to Pierce Bid No. 748 dated Jan. 27, 2022, with payment made directly to Firematic); Pierce Manufacturing Inc., *Wilton Fire Department—Aerial*, https://www.piercemfg.com/customers/new-deliveries/wilton-fire-department-aerial-38807 (identifying the delivered apparatus as an Arrow XT with a 105-foot Heavy-Duty Steel Aerial Ladder and Firematic Supply Company, Inc. as the sales organization). Because apparatus pricing varies with chassis, specifications, options, payment terms, and order timing, the Wilton transaction is not alleged to be an exact apples-to-apples comparison; rather, it provides circumstantial evidence that a substantially similar Pierce aerial sold through the same authorized dealer outside New York carried a lower headline purchase price.

[23] *See* Eastchester Fire District, Board of Fire Commissioners, *Regular Meeting Minutes* (Aug. 11, 2022), Resolution No. 100, https://www.eastchesternyfd.gov/DocumentCenter/View/400/Minutes—EBOFC-Regular-Meeting-81122 (authorizing the Fire Chief to execute a sales contract with Firematic Supply Company, Inc. for one Pierce Enforcer Ascendant 100-foot Tower Ladder, with the options identified in

173. In November 2021, the Village of Greenport, New York awarded Firematic/Pierce a contract for a 100-foot heavy-duty aerial tower for $1,650,000.[24]

174. In August 2022, Eastchester Fire District, New York approved a Firematic contract based on a July 18, 2022, Pierce bid for a Pierce Enforcer Ascendant 100-foot Tower Ladder for $1,852,000.

175. Although these transactions do not involve apparatus identical in every respect to Lynbrook's, they reflect materially different final prices for closely related Pierce aerial products.

176. Those price differences support the inference that factors beyond apparatus specifications and production costs, including dealer margins, geographic pricing rules, rebates, surcharges, and territorial restrictions—affected the prices charged to municipal purchasers.

177. Because Firematic serves municipal purchasers in both New York and Connecticut, comparisons of its Pierce transactions permit dealer identity to be held constant and provide a meaningful basis for evaluating whether purchaser location affected price or other economic terms.

---

Pierce Bid No. 817 dated July 18, 2022, for a total price of $1,852,000 pursuant to the Houston-Galveston Area Council cooperative-purchasing program); see also Eastchester Fire District, *November 2022 Newsletter*, https://www.eastchesternyfd.gov/CivicSend/ViewMessage/message/183348 (confirming that the District ordered a 100-foot mid-mount tower ladder from Pierce's local dealer, Firematic Supply Inc.).

[24] *See* Village of Greenport, N.Y., Board of Trustees, *Regular Session Minutes* (Dec. 23, 2021), https://villageofgreenport.gov/minutes/VGPBOT122321RS.pdf, Resolution No. 12-2021-23 (awarding Firematic Supply Company Inc./Pierce Manufacturing the contract for the purchase of a 100-foot heavy-duty aerial tower and related equipment for the Greenport Fire Department for a total price of $1,650,000, following the November 18, 2021 bid opening); see also Village of Greenport, N.Y., *Bond Resolution* (Feb. 24, 2022), https://villageofgreenport.org/minutes/VGPBOT022422RS.pdf (authorizing issuance of $1,650,000 in bonds to finance acquisition of the new fire truck and apparatus).

178. After accounting for material differences in specifications and transaction timing, the observed pricing disparities support the inference that purchaser location systematically affected Pierce's factory or transfer prices, Firematic's margins, discounts, rebates, surcharges, cooperative-purchasing adjustments, or other economic terms.

179. The antitrust concern is not price variation standing alone.

180. Lynbrook alleges that geographic price differences become actionable where they are produced or maintained by an agreement, arrangement, or combination that restricts cross-territorial dealer competition, allocates customers or territories, coordinates pricing practices, or otherwise prevents New York purchasers from obtaining the benefits of lower-priced interstate competition.

181. Authorized dealer territories and manufacturer rules materially restrict the ability of a New York municipality to solicit the same branded apparatus from competing authorized dealers in Connecticut, New Jersey, Pennsylvania, or other states.

182. Such restrictions can deprive New York purchasers of the ability to arbitrage lower dealer prices, use competing out-of-state quotations to discipline the local dealer's price or purchase substantially identical branded apparatus through a lower-cost dealer channel.

183. Lynbrook's 2023 Pierce procurement illustrates the alleged vulnerability.

184. Lynbrook received only one bid for the Pierce 100-foot Heavy Duty Aerial Ladder Truck or equal, from Firematic, in the amount of $1,489,000.

185. In a market in which Pierce controls the manufacturer level and Firematic operates as the authorized dealer serving the relevant territory, the absence of intrabrand dealer competition can permit location-sensitive pricing to persist without competitive discipline.

186. But for the territorial restraints and coordinated distribution practices challenged herein, Lynbrook and other New York purchasers could have solicited substantially identical Fire Apparatus from additional authorized dealers, including dealers serving nearby states, and could have used lower competing quotations to reduce the prices paid in New York.

187. The pricing mechanisms at issue are implemented and reflected through manufacturer price books and configuration software; state- and territory-specific pricing tables; dealer cost sheets and factory invoices; discounts, rebates, and dealer-margin schedules; cooperative-purchasing prices; freight, tax, and surcharge components; quote histories and lost-bid reports; communications concerning New York pricing; rules governing sales outside assigned territories; and transaction-level pricing for substantially similar Fire Apparatus sold in New York and neighboring states.

188. If that evidence shows that Defendants jointly maintained higher New York prices through territorial allocation, restrictions on cross-border dealer competition, or coordinated location-based pricing not justified by legitimate cost differences, those practices constitute an additional unreasonable restraint of trade under the Donnelly Act and further evidence of the broader conspiracy alleged herein.

## XI. CONCEALMENT AND TOLLING

189. Defendants' conspiracy and coordination were not reasonably discoverable by Lynbrook when the relevant purchases were made.

190. Lynbrook reasonably understood the Fire Apparatus market to be competitive and had no access to private competitor communications, confidential FAMA data, or internal pricing, capacity, and strategic materials.

191. Defendants' use of confidential data exchanges, members-only meetings, nonpublic communications, and conduct presented to purchasers as independent business decisions concealed the alleged combination and prevented Lynbrook from learning the facts necessary to plead its claims.

192. Public investigative reporting and governmental scrutiny beginning in 2025 brought together facts concerning consolidation, severe price increases, capacity restraints, backlogs, and industry coordination in a manner that reasonably placed purchasers on inquiry notice of possible antitrust wrongdoing.[25]

193. Accordingly, any applicable limitations period is tolled by fraudulent concealment and equitable tolling to the extent permitted by law.

---

[25] *See, e.g.*, Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, N.Y. Times (Apr. 15, 2025) (reporting escalating fire-apparatus prices and delivery delays, extensive industry consolidation, manufacturing-plant closures, and a bipartisan Senate investigation into whether private-equity consolidation contributed to the crisis), summarized at Sen. Elizabeth Warren, *New York Times: Senators Investigate Private Equity Role in Soaring Fire-Truck Costs* (Apr. 15, 2025) ; Letter from Sens. Elizabeth Warren & Jim Banks to Int'l Ass'n of Fire Fighters (Apr. 15, 2025) (stating that dominant manufacturers were allegedly exploiting consolidated market power to "hike fire truck prices and restrict fire truck supply," and documenting pumper prices rising from approximately $500,000 in 2013 to nearly $1 million and ladder-truck prices from approximately $900,000 to nearly $2 million, far outpacing relevant inflation measures) ; Press Release, Sens. Josh Hawley & Andy Kim, *Hawley, Kim Demand Answers from Major Companies after Backlog, Soaring Prices Hamper Fire Department Readiness* (Apr. 3, 2025) (initiating bipartisan Senate scrutiny of REV Group, Oshkosh, and Rosenbauer after reports that the three firms controlled approximately 70–80% of the market and requesting detailed information concerning delayed deliveries, pricing histories, and customer complaints) ; Dietrich Knauth, *As Fire Truck Prices Hit $2 Million, U.S. Firefighters Demand an Antitrust Probe*, **Reuters** (May 13, 2025) (reporting the IAFF and American Economic Liberties Project's request that DOJ and FTC investigate consolidation and possible anticompetitive conduct in a market dominated by REV, Oshkosh/Pierce, and Rosenbauer, amid prices approaching $2 million and delivery delays of up to four years) ; Sen. Elizabeth Warren, *ICYMI: At Hearing, Warren Renews Push on Private Equity's Threat to Fire Fighters and Public Safety* (Sept. 11, 2025) (describing Senate testimony concerning a market in which three manufacturers controlled approximately 80% of production and allegations that consolidation permitted manufacturers to raise prices, restrict supply, and generate substantial equipment backlogs) .

194. Independently, each new sale at an allegedly supracompetitive price, each new surcharge or floating-price increase, and each renewed agreement or overt act that caused new injury constitutes a new and independent act for limitations purposes.

## XI. CLASS ACTION ALLEGATIONS

### A. Nationwide injunctive class

195. Lynbrook seeks certification under Rule 23(b)(2) of a nationwide injunctive class of governmental and other purchasers that face future injury from Defendants alleged ongoing anticompetitive conduct, to the extent the Court determines such a class is appropriate (the "Injunctive Class").

196. The members of the proposed Injunctive Class are sufficiently numerous and geographically dispersed that joinder is impracticable.

197. New York alone contains a substantial number of municipalities, fire districts, fire companies, public authorities, and other purchasers of Fire Apparatus.[26]

---

[26] *See, e.g.*, Mike Baker, *Senators Investigate Private Equity Role in Soaring Fire-Truck Costs*, **N.Y. Times** (Apr. 15, 2025) (reporting escalating fire-apparatus prices and delivery delays, extensive industry consolidation, manufacturing-plant closures, and a bipartisan Senate investigation into whether private-equity consolidation contributed to the crisis), summarized at Sen. Elizabeth Warren, *New York Times: Senators Investigate Private Equity Role in Soaring Fire-Truck Costs* (Apr. 15, 2025) ; Letter from Sens. Elizabeth Warren & Jim Banks to Int'l Ass'n of Fire Fighters (Apr. 15, 2025) (stating that dominant manufacturers were allegedly exploiting consolidated market power to "hike fire truck prices and restrict fire truck supply," and documenting pumper prices rising from approximately $500,000 in 2013 to nearly $1 million and ladder-truck prices from approximately $900,000 to nearly $2 million, far outpacing relevant inflation measures) ; Press Release, Sens. Josh Hawley & Andy Kim, *Hawley, Kim Demand Answers from Major Companies after Backlog, Soaring Prices Hamper Fire Department Readiness* (Apr. 3, 2025) (initiating bipartisan Senate scrutiny of REV Group, Oshkosh, and Rosenbauer after reports that the three firms controlled approximately 70–80% of the market and requesting detailed information concerning delayed deliveries, pricing histories, and customer complaints) ; Dietrich Knauth, *As Fire Truck Prices Hit $2 Million, U.S. Firefighters Demand an Antitrust Probe*, **Reuters** (May 13, 2025) (reporting the IAFF and American Economic Liberties Project's request that DOJ and FTC investigate consolidation and possible anticompetitive conduct in a market dominated by REV, Oshkosh/Pierce, and Rosenbauer, amid prices approaching $2 million and delivery delays of up to four years) ; Sen. Elizabeth Warren, *ICYMI: At Hearing, Warren Renews Push on Private Equity's Threat to Fire Fighters and Public Safety* (Sept. 11, 2025) (describing Senate testimony concerning a market in

198. Common questions include:

a. whether Defendants agreed or coordinated to restrain trade;

b. whether Defendants exchanged competitively sensitive information;

c. whether Defendants restricted output;

d. whether Defendants' conduct caused supracompetitive manufacturer prices;

e. whether the overcharges were passed through distribution channels;

f. the duration and scope of the Defendants' conduct;

g. the appropriate class-wide methodology for measuring overcharge and pass-through;

h. whether limitations periods were tolled;

i. the appropriate declaratory and injunctive relief;

j. whether dealer-territory restrictions impaired interstate or intrabrand competition;

k. whether purchaser location affected pricing after controlling for legitimate cost and specification differences; and

l. whether New York purchasers paid a measurable geographic premium.

199. Lynbrook's claims are typical because it purchased Fire Apparatus during the Class Period through an intermediary and paid prices that incorporated the same alleged manufacturer-level overcharge affecting other New York indirect purchasers.

200. Lynbrook will fairly and adequately protect the Injunctive Class.

---

which three manufacturers controlled approximately 80% of production and allegations that consolidation permitted manufacturers to raise prices, restrict supply, and generate substantial equipment backlogs) .

201. Its interests are aligned with those of the Class, and it has retained counsel experienced in antitrust, complex litigation, and class actions.

202. Common issues predominate because liability, market impact, overcharge, and pass-through can be proven principally through Defendants' and dealers' common records and economic evidence. Individual damages calculations do not defeat predominance.

203. A class action is superior because the claims arise from the same alleged market-wide conduct; common adjudication avoids inconsistent results and duplicative expert proceedings; and centralized adjudication is particularly efficient given the related multidistrict litigation pending in this District.

204. Defendants have acted or refused to act on grounds generally applicable to purchasers nationwide, making declaratory and injunctive relief appropriate with respect to the proposed injunctive class.

**B. NEW YORK DAMAGES CLASS AND GOVERNMENTAL CLASSES (TOGETHER, the "New York Classes")**

205. Plaintiff also brings this action individually and on behalf of itself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

**i. New York Damages Class**

206. Plaintiff seeks certification of the following New York Damages Class:

All persons and entities that, during the period beginning January 1, 2016 and continuing through the present, or through such later date as the evidence establishes that Defendants' alleged conspiracy, combination, agreement, or other anticompetitive conduct remained in effect and continued to cause injury to purchasers of Fire Apparatus ( the "Class Period"), purchased, paid for, or reimbursed all or part of the purchase price of Fire Apparatus for delivery to or use in the State of New York and were injured by Defendants' unlawful conduct.

207. The New York Damages Class includes purchasers that acquired Fire Apparatus directly from one or more Defendants and purchasers that acquired Fire Apparatus indirectly through an authorized dealer, distributor, intermediary, cooperative-purchasing program, purchasing consortium, or other channel of distribution.

**ii. New York Governmental Class**

208. Plaintiff seeks certification of the following:

All municipalities, counties, cities, towns, villages, fire districts, public authorities, and other political subdivisions or governmental or quasi-governmental entities of the State of New York that, during the Class Period, purchased, paid for, or reimbursed all or part of the purchase price of Fire Apparatus for delivery to or use in New York and were injured by Defendants' unlawful conduct.

209. Excluded from the New York Classes are Defendants; their parents, subsidiaries, affiliates, successors, predecessors, and co-conspirators; their officers and directors; the judicial officers assigned to this action and members of their immediate families; and any person or entity that validly and timely excludes itself from the Class.

**Numerosity**

210. New York is populated by hundreds of fire districts and more than a thousand counties, cities, towns, and villages, together with municipal fire departments, public authorities, fire companies, and other governmental entities that purchase or finance Fire Apparatus.

211. The members of the New York Classes are sufficiently numerous that joinder of all members is impracticable.

212. New York alone contains hundreds of governmental fire-protection entities and a substantial number of additional municipalities, fire companies, public authorities, and other purchasers that purchased Fire Apparatus during the Class Period.

213. Members of the Classes are geographically dispersed throughout New York, and their identities and transactions can be determined through Defendants' sales records, dealer records, municipal procurement records, cooperative-purchasing records, and other objective sources.

**Commonality**

214. There are questions of law and fact common to Plaintiff and the New York Classes, including:

a. whether Defendants entered into a contract, combination, conspiracy, arrangement, or understanding to restrain competition in the manufacture, distribution, and sale of Fire Apparatus;

b. whether Defendants coordinated, facilitated, or knowingly participated in restrictions on manufacturing capacity or output;

c. whether Defendants exchanged competitively sensitive information concerning prices, production, capacity, backlogs, costs, dealer activity, customers, bids, or market conditions;

d. whether Defendants' dealer territories, distribution restraints, cooperative-purchasing practices, or related arrangements reduced competition between or among manufacturers or dealers;

e. whether Defendants suppressed competition in the sale of Fire Apparatus in New York;

f. whether Defendants' conduct caused Fire Apparatus prices to be higher than they would have been in a competitive market;

g. whether Defendants' conduct violated New York General Business Law § 340;

h. whether Defendants' unlawful manufacturer-level overcharges were passed through to purchasers acquiring Fire Apparatus through dealers, distributors, cooperative-purchasing programs, or other intermediaries;

i. whether Plaintiff and Class members suffered common antitrust impact;

j. whether damages can be determined through common economic and statistical methodologies;

k. whether Defendants concealed the existence, nature, scope, or effects of their unlawful conduct;

l. whether applicable statutes of limitations were tolled, suspended, or otherwise extended;

m. whether Defendants should be enjoined from continuing the challenged conduct; and

n. the appropriate measure of damages and other relief.

**Typicality**

215. Plaintiff's claims are typical of the claims of members of the New York Classes.

216. Like other members Plaintiff purchased Fire Apparatus during the Class Period, was exposed to the same allegedly anticompetitive market conditions, paid prices affected by the same alleged conspiracy, and suffered the same type of overcharge injury.

217. Any factual differences among individual apparatus transactions—including differences in model, chassis, configuration, options, aerial length, pumping capacity, financing, payment terms, delivery date, trade-in allowances, or purchasing mechanism—do not change the common nature of the alleged antitrust violation or the type of injury suffered.

218. Those transaction-specific variables are measurable and capable of controlling using Defendants' and dealers' transaction-level data.

**Adequacy**

219. Plaintiff will fairly and adequately protect the interests of the New York Classes.

220. Plaintiff's interests are aligned with the interests of absent Class members because Plaintiff and the New York Classes seek to establish the same unlawful conduct and recover the same category of overcharge damages.

221. Plaintiff has no interests antagonistic to or in conflict with the interests of the Classes.

222. Plaintiff has retained counsel experienced in antitrust, class-action, complex commercial, and governmental-purchaser litigation and will vigorously prosecute this action on behalf of the Classes.

**Predominance**

223. Questions of law and fact common to the New York Classes predominate over questions affecting only individual members.

224. Whether Defendants conspired or otherwise engaged in unlawful anticompetitive conduct will be established principally through evidence concerning Defendants' conduct, including internal communications, pricing documents, production and capacity records, backlog

data, dealer agreements, cooperative-purchasing agreements, bidding information, sales records, and economic evidence common to all members of these Classes.

225. The anticompetitive effect of the alleged conduct likewise presents a common issue susceptible to proof through market-wide evidence.

226. Antitrust impact is capable of common proof by determining whether Defendants' conduct elevated the general level or structure of Fire Apparatus prices above the level that would have prevailed absent the challenged conduct.

227. Damages are capable of determination through common methodologies, including econometric regression analysis, benchmark analysis, before-and-after analysis, yardstick comparisons, cost and margin analysis, and comparisons between actual transaction prices and estimated competitive but-for prices.

228. Differences among Fire Apparatus transactions do not defeat predominance because relevant characteristics, including manufacturer, model, apparatus type, chassis, aerial configuration, pump capacity, options, order date, delivery date, dealer, and payment terms—can be identified and incorporated as variables in a common economic model.

229. Pass-throughs to these Classes are likewise capable of determination through common proof concerning Defendants' dealer structures, manufacturer-to-dealer pricing, dealer margins, contractual relationships, transaction records, and the economic operation of the Fire Apparatus distribution system.

230. New York General Business Law § 340(6) specifically contemplates actions involving indirect purchasers and directs courts to take appropriate measures to avoid duplicative liability.

**Superiority**

231. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

232. Separate prosecution by numerous New York municipalities, fire districts, public authorities, fire companies, and other purchasers would require repeated litigation concerning the same alleged conspiracy, substantially the same documentary and testimonial evidence, the same market structure, and substantially the same economic questions.

234. Separate actions also would create a risk of inconsistent adjudications concerning the existence and scope of Defendants' alleged conspiracy and would impose unnecessary costs upon governmental entities and the judicial system.

235. Concentrating these claims in a single proceeding will promote judicial economy, enable coordinated discovery, permit common expert analysis, and provide a consistent adjudication of Defendants' alleged conduct.

236. Plaintiff therefore seeks certification of the New York Classes pursuant to Rules 23(a) and 23(b)(3), appointment of Plaintiff as a Class and Subclass representative, and appointment of Plaintiff's counsel as Class Counsel.

## XII. CLAIMS FOR RELIEF

### COUNT I

**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1- Declaratory and Injunctive Relief**

237. Lynbrook incorporates the preceding allegations.

238. Defendants entered into an unlawful contract, combination, or conspiracy in restraint of interstate trade and commerce in Fire Apparatus, including agreements or coordinated practices to raise, fix, maintain, or stabilize prices, restrict output, and exchange competitively sensitive information.

239. The conduct is unlawful under the per se rule to the extent it constitutes horizontal price fixing or output restriction. It is independently unlawful under the rule of reason because its anticompetitive effects outweigh any legitimate procompetitive justification and any legitimate objective could be achieved through less restrictive means.

240. Lynbrook seeks declaratory and prospective injunctive relief under Section 16 of the Clayton Act because it faces a substantial threat of future injury from continued purchases in the allegedly restrained market.

241. Unless enjoined, Defendants' conduct will continue to impair competition and expose Lynbrook and Class members to supracompetitive prices, restricted output, lengthy backlogs, and anticompetitive purchasing terms.

**COUNT II –**

**Attempted Monopolization, 15 U.S.C. § 2 — Declaratory and Injunctive Relief Against REV Group/AIP**

242. Lynbrook incorporates the preceding allegations.

243. AIP and REV Group pursued a deliberate series of horizontal acquisitions and related exclusionary practices designed to concentrate Fire Apparatus manufacturing, reduce independent competition, increase barriers to entry, control important chassis and production inputs, and obtain or approach monopoly power in relevant Fire Apparatus markets.

244. REV Group acquired substantial market power, including a market share exceeding approximately 30% and the ability to raise prices, reduce output, lengthen delivery times, and impose less favorable terms without losing substantial sales.

245. The combination of REV Group's market share, control of formerly independent brands, control over important inputs, high barriers to entry, and exclusionary conduct creates a dangerous probability of monopolization in one or more relevant markets.

246. Lynbrook seeks declaratory and injunctive relief under Section 16 of the Clayton Act to prevent future injury threatened by this conduct.

**COUNT III**

**Attempted Monopolization, 15 U.S.C. § 2 — Declaratory and Injunctive Relief Against Oshkosh/Pierce**

247. Lynbrook incorporates the preceding allegations.

248. Oshkosh and Pierce pursued acquisitions, ownership interests, collaborations, dealer-territory consolidation, and other conduct that increased concentration and reduced independent competition in Fire Apparatus and related submarkets.

249. Oshkosh and Pierce possess substantial market power, reinforced by high entry barriers, established dealer networks, brand-specific procurement requirements, and control over important product and distribution channels.

250. The challenged conduct, together with Oshkosh/Pierce's market position, creates a dangerous probability of monopolization in one or more relevant markets and threatens continuing injury to municipal purchasers.

251. Lynbrook seeks declaratory and injunctive relief under Section 16 of the Clayton Act.

**COUNT IV**

**Violation of New York General Business Law § 340 (Donnelly Act) - Indirect Purchaser Damages**

252. Lynbrook incorporates the preceding allegations.

253. Fire Apparatus is essential public-safety equipment. Governmental purchasers cannot reasonably respond to supracompetitive prices by simply ceasing to purchase indefinitely

because engines, pumpers, aerials, rescues, tankers, and other apparatus must be maintained and replaced to provide essential fire-protection and emergency-response services.

254. The long, useful lives of Fire Apparatus, lengthy procurement cycles, limited manufacturing capacity, long delivery backlogs, and absence of reasonably interchangeable substitutes further constrained the ability of New York governmental purchasers to avoid Defendants' alleged supracompetitive prices.

255. These market characteristics made New York governmental purchasers particularly susceptible to injury from coordinated output restrictions, capacity restraints, pricing practices, dealer restrictions, information exchanges, and other anticompetitive conduct alleged herein.

**A. Indirect Purchaser Standing Under New York Law**

256. New York expressly permits persons and governmental entities injured by anticompetitive conduct to recover damages regardless of whether they purchased directly from the antitrust violator.

257. New York General Business Law § 340(6) provides that, in an action under the Donnelly Act, the fact that the State, a political subdivision or public authority, or any other injured person has not dealt directly with the defendant shall not bar or otherwise limit recovery.

258. New York therefore has legislatively displaced the federal indirect-purchaser limitation established by *Illinois Brick* for claims brought under the Donnelly Act.

259. Accordingly, to the extent Plaintiff or any member of the New York Damages or Governmental Class purchased Fire Apparatus through Firematic, another authorized dealer, distributor, intermediary, cooperative-purchasing organization, purchasing consortium, or other

channel of distribution rather than purchasing directly from a manufacturer Defendant, that circumstance does not bar or limit recovery under New York General Business Law § 340.

**B. Pass-Through and Antitrust Injury**

260. Defendants' conspiracy and other anticompetitive practices operated at the manufacturer level of the Fire Apparatus market and caused prices charged for Fire Apparatus to be higher than they would have been in a competitive market.

261. Defendants sold Fire Apparatus in New York through established networks of authorized dealers and distributors.

262. Those dealers and distributors constituted conduits through which Fire Apparatus manufactured by Defendants was marketed, configured, sold, invoiced, delivered, and serviced for New York purchasers.

263. Defendants knew and intended that Fire Apparatus sold or allocated through their authorized New York dealers ultimately would be purchased and paid for by municipalities, fire districts, fire companies, public authorities, and other end users.

264. The manufacturer-level overcharges resulting from Defendants' unlawful conduct were passed through to purchasers acquiring Fire Apparatus through authorized dealers, distributors, intermediaries, cooperative-purchasing programs, and other distribution channels.

265. Fire Apparatus is not an ordinary commodity for which an intermediary is free to substitute unrelated products.

266. Purchasers solicit or specify apparatus based upon manufacturer, chassis, configuration, pumping capacity, aerial capability, safety equipment, and other mission-specific requirements.

267. Authorized dealers transmit manufacturer costs and manufacturer-level price increases to the ultimate purchaser as components of the final transaction price.

268. Defendants entered and implemented information and agreement, arrangement, combination, or conspiracy that restrained competition in the sale of Fire Apparatus in New York, including by coordinating prices or pricing practices, restricting output, exchanging competitively sensitive information, and maintaining market conditions that enabled supracompetitive prices.

269. The challenged conduct affected business and commerce in New York because Manufacturer Defendants sold Fire Apparatus for delivery to and use by New York municipalities and fire departments through authorized dealers and other intermediaries, including Lynbrook's Class-Period purchases.

270. Lynbrook and the New York Classes members sustained damages because manufacturer-level overcharges were incorporated into and passed through the distribution chain, causing them to pay more for Fire Apparatus than they would have paid in a competitive market.

271. Under General Business Law § 340(6), Lynbrook's lack of direct dealing with a Manufacturer Defendant does not bar or limit its recovery.

272. Under General Business Law § 340(5), Lynbrook and the New York Classes are entitled to recover three-fold their actual damages, reasonable attorneys' fees, and recoverable costs, subject to measures necessary to avoid duplicate recovery.

273. Lynbrook has complied, or before commencement will comply, with the statutory notice requirement applicable to a New York political subdivision.

## COUNT V

**Violation of New York General Business Law § 340 (Donnelly Act) Geographic Market Allocation and New York-Specific Pricing**

274. Lynbrook incorporates the preceding allegations.

275. Defendants, through agreements, arrangements, territorial dealer structures, and coordinated distribution practices, restrained competition for Fire Apparatus sold to New York purchasers by limiting or impairing cross-territorial dealer competition and thereby facilitating the maintenance of supracompetitive and potentially location-sensitive prices.

276. This Count does not rest on price discrimination standing alone. Rather, Lynbrook challenges concerted conduct that allegedly allocates territories or customers, restricts authorized dealers from competing across geographic boundaries, coordinates pricing practices, or otherwise prevents New York purchasers from obtaining lower-priced offers for substantially similar branded Fire Apparatus available through competing dealer channels.

277. Public procurement records reveal potentially significant price differences among substantially similar Pierce aerial apparatuses sold through Firematic in New York and Connecticut.

278. Those records constitute circumstantial evidence warranting discovery into whether purchaser location affected manufacturer pricing, dealer margins, discounts, rebates, surcharges, or other economic terms after controlling for legitimate differences in specifications, timing, freight, taxes, and payment terms.

279. The challenged territorial and pricing arrangements had substantial effects in New York because they limited the competitive alternatives available to New York municipalities, including Lynbrook, and impaired their ability to use competing out-of-state authorized dealers or quotations to discipline local prices.

280. As a direct and proximate result of the alleged restraint, Lynbrook and members of the New York Classes paid more for Fire Apparatus than they would have paid in a market permitting effective interstate and intrabrand dealer competition.

281. Under General Business Law § 340(6), Lynbrook's indirect-purchaser status does not bar recovery. Lynbrook and the Class seek treble damages, attorneys' fees, costs, declaratory relief, and such other relief as New York law permits, without duplicative recovery.

**COUNT VI**

**Unjust Enrichment / Restitution — Pleaded in the Alternative Under New York Law**

282. Lynbrook incorporates the preceding allegations.

283. This claim is pleaded in the alternative and only to the extent permitted by New York law and not displaced by an adequate statutory remedy.

284. Defendants obtained and retained economic benefits derived from supracompetitive manufacturer prices ultimately funded by purchasers such as Lynbrook.

285. To the extent particular Defendants received portions of Lynbrook-funded overcharges under circumstances where equity recognizes restitution notwithstanding the intermediary distribution chain, retention of those benefits would be unjust.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Classes and Subclasses, respectfully requests that the Court enter judgment in its favor and against Defendants and grant the following relief:

A. Certify this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as applicable;

B. Appoint Plaintiff as representative of the Classes;

C. Appoint Plaintiff's counsel as Class Counsel pursuant to Federal Rule of Civil Procedure 23(g);

D. Declare that Defendants entered into and participated in an unlawful contract, combination, conspiracy, arrangement, or understanding in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

E. Declare, to the extent alleged in the Complaint, that Defendants unlawfully monopolized, attempted to monopolize, maintained monopoly power, or otherwise violated Section 2 of the Sherman Act, 15 U.S.C. § 2;

F. Declare that Defendants' conduct violated New York General Business Law § 340 and any other applicable state antitrust, unfair competition, consumer-protection, or related laws asserted in the Complaint;

G. Enter appropriate declaratory and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and applicable state law, prohibiting Defendants from continuing, maintaining, enforcing, or renewing the unlawful practices alleged herein;

H. Enjoin Defendants from entering, maintaining, or enforcing any agreement, arrangement, practice, or course of conduct that unlawfully fixes, raises, maintains, stabilizes, or coordinates Fire Apparatus prices;

I. Enjoin Defendants from unlawfully restricting Fire Apparatus manufacturing capacity, output, production, or availability;

J. Enjoin Defendants from unlawfully exchanging competitively sensitive information concerning prices, costs, margins, production, capacity, backlogs, customers, bids, territories, dealer activity, or other competitive conditions;

K. Enjoin Defendants from maintaining or enforcing unlawful dealer-territory restrictions, market-allocation arrangements, cooperative-purchasing practices, or other distribution restraints that suppress competition;

L. Award Plaintiff and members of the Classes damages in an amount to be determined at trial for the supracompetitive overcharges and other injuries caused by Defendants' unlawful conduct;

M. Award Plaintiff and members of the New York Classes threefold their actual damages pursuant to New York General Business Law § 340(5);

N. Award restitution, disgorgement, restitutionary disgorgement, or other equitable monetary relief to the extent authorized by applicable law;

O. Order Defendants to account for and disgorge profits, revenues, or other gains wrongfully obtained through unlawful conduct alleged herein to the extent such relief is legally available;

P. Establish an appropriate mechanism for allocating recoveries among direct and indirect purchasers, including the creation of subclasses or claims-allocation procedures where necessary, so as to prevent duplicative recovery while preserving all rights afforded under New York General Business Law § 340(6) and other applicable law;

Q. Award prejudgment interest on all monetary relief from the earliest date permitted by law;

R. Award post-judgment interest pursuant to 28 U.S.C. § 1961 and any other applicable law;

S. Award Plaintiff and Class members their reasonable attorneys' fees and litigation expenses pursuant to the Clayton Act, New York General Business Law § 340, and all other applicable statutes and doctrines;

T. Award Plaintiff and Class members their taxable costs of suit;

U. Order such structural, behavioral, or other equitable relief as may be necessary to restore competitive conditions in the Fire Apparatus market and prevent recurrence of unlawful conduct;

V. Retain jurisdiction to administer, supervise, and enforce any judgment or injunctive relief entered in this action; and

W. Grant such other and further legal, equitable, or declaratory relief as the Court deems just and proper.

## XIV. JURY DEMAND

Lynbrook demands a trial by jury on all issues so triable.

Dated: October 15, 2026

Respectfully submitted,

**ADEMI LLP**

By: /s/ John D. Blythin
Guri Ademi (WI 1021729)
John D. Blythin (WI 1046105)
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel. 414-482-8000
Fax 414-482-8001
gademi@ademilaw.com
jblythin@ademilaw.com

**ZWERLING, SCHACHTER & ZWERLING, LLP**

Robert S. Schachter (admitted in the E.D. Wis.)

*Counsel for Plaintiff Incorporated Village of Lynbrook*